# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

——————————

Nº 05 Civ. 6278 (RJS)

——————————

VERNICE RICHARDSON and TERRANCE RICHARDSON,

Plaintiffs,

VERSUS

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, *et al.*,

Defendants.

——————————

OPINION AND ORDER
March 25, 2009

——————————

RICHARD J. SULLIVAN, District Judge:

Vernice Richardson and her husband Terrance Richardson bring this civil rights action under 42 U.S.C. § 1983 and New York State law, seeking money damages from the New York City Health and Hospitals Corporation ("HHC") and several of its police officers in connection with events relating to Vernice Richardson's April 1, 2005 arrest at the Jacobi Medical Center. The Complaint contains claims under 42 U.S.C. § 1983 for false arrest, excessive force, malicious prosecution, malicious abuse of process, civil conspiracy, First Amendment retaliation, and municipal liability (the "federal claims"). The Complaint also contains parallel claims under New York State law, as well as claims for loss of services and loss of consortium by Terrance Richardson (the "state law claims").

Before the Court is Defendants' motion for summary judgment. For the reasons stated below: (1) Defendants' motion is granted as to all federal claims and the state law claims for false arrest and malicious abuse of process; and (2) the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I. BACKGROUND

### A. Facts[1]

On the evening of April 1, 2005, an HHC police officer named Robert Aponte placed a "traffic boot" on Plaintiff's vehicle in a parking lot at the Jacobi Medical Center because Plaintiff had failed to display properly a valid parking permit.[2] When Plaintiff arrived at the vehicle after work, she objected to the officer's decision and an argument ensued.

Plaintiff's claims arise out of her subsequent arrest on that evening for assaulting a police officer and disorderly conduct. Plaintiff was handcuffed and detained, but ultimately released that evening. She sought medical treatment the next morning for pain in her shoulder and red marks on her wrists. It is undisputed that the criminal charges against Plaintiff were dismissed after a single court appearance, but that Plaintiff was disciplined by HHC for her behavior in connection with these events.

#### 1. Parties

At the time of the events in question, Plaintiff had worked at HHC for twenty-six years as a Clerical Associate at the Jacobi Medical Center in the Bronx. (Pls.' 56.1 at 2 ¶ 4.) She has been married to her husband, Co-Plaintiff Terrance Richardson, for over twenty-three years. (*Id.* at 2 ¶ 2.)

The Complaint names Defendants HHC, six HHC police officers, and an unspecified number of "John/Jane Does." The named HHC officers are Officer Robert Aponte, Officer Jesus Rosario, Lieutenant John Arceo, Officer Marion Mullins, Officer Jose Diaz, and Sergeant Leonard Waterman (collectively, the "Individual Defendants").

#### 2. The Argument Over Plaintiff's Parking Violation

At approximately 5:00 p.m. on April 1, 2005, Plaintiff and an HHC co-worker, Maria Rivera ("Rivera"), exited their office and walked toward Plaintiff's car in Parking Lot 1 of the Jacobi Medical Center ("Lot 1"). (Defs.' 56.1 ¶ 9.) Plaintiff and Rivera arrived at Plaintiff's car at approximately 5:15 p.m., and they observed that a "yellow traffic boot" had been placed on one of the wheels, which immobilized the vehicle. (Defs.' 56.1 ¶¶ 7, 10-11.)

The boot had been placed on the vehicle by HHC Officer Robert Aponte ("Officer Aponte") because Plaintiff had not properly displayed a valid parking pass on the rearview mirror of the vehicle. (*Id.* ¶¶ 6-7.) Although

---

[1] The facts described below are taken from the parties' Local Rule 56.1 Statements, the affidavits submitted in connection with the instant motion, and the exhibits attached thereto. Because Plaintiffs' 56.1 Statement contains both a response to Defendants' 56.1 Statement and a counter statement of material facts, citations to that document include both page and paragraph numbers. Where only one party's Rule 56.1 Statement is cited, the opposing parties do not dispute that fact or have not presented admissible evidence to controvert that fact.

[2] Plaintiff Vernice Richardson is the central figure in the facts that are relevant to this action, and she brings almost all of the claims in the Complaint. Co-Plaintiff Terrance Richardson makes few, if any, independent allegations, and his sole claims are for loss of services and loss of consortium under New York State law. (Compl. ¶ 49.) "Under New York law, a claim for loss of companionship, society, services, or support is derivative of the related primary causes of action . . . ." *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 585 (S.D.N.Y. 2008). Accordingly, for purposes of clarity, although Terrance Richardson is named as a Plaintiff in the Complaint, the Court refers to a singular Plaintiff, Vernice Richardson, unless otherwise noted.

2

Plaintiff received a new, valid parking pass in mid-March 2005, the valid pass was hanging behind an expired parking pass on the rearview mirror and was not visible from the front of the vehicle. (*Id.* ¶¶ 5-6.)

Officer Aponte was near Plaintiff's car when Plaintiff and Rivera first arrived and discovered the boot. (*See* Pls.' 56.1 at 2 ¶ 6.) Plaintiff showed Officer Aponte her valid parking sticker and asked him to remove the boot. (*Id.* at 2 ¶ 9; Defs' 56.1 ¶ 12.) Officer Aponte stated that he lacked authority to do so, and he instructed Plaintiff that she had to go to Building 4 of the Jacobi Medical Center in order to complete the necessary paperwork to have the boot removed. (Defs.' 56.1 ¶ 13.)

As Plaintiff and Rivera were walking toward Building 4, Rivera stated to Plaintiff that Officer Aponte was an "idiot." (Pls.' 56.1 at 3 ¶ 12.) Plaintiff alleges that Officer Aponte heard the comment, and that he responded by cursing at Rivera and calling *her* an idiot. (*Id.* at 3 ¶ 14; *see also* Defs.' 56.1 ¶ 15.) After the verbal exchange, Plaintiff and Rivera proceeded to Building 4, and Officer Aponte contacted HHC Officer Jesus Rosario ("Officer Rosario") regarding the boot on Plaintiff's vehicle. (Defs.' 56.1 ¶ 17; Pls.' 56.1 at 3 ¶ 15.)

At some point thereafter, prior to the time Plaintiff and Rivera returned to Lot 1, Officer Aponte received a communication from HHC Officer Marion Mullins ("Officer Mullins") indicating that he was authorized to remove the boot from Plaintiff's vehicle. (Defs.' 56.1 ¶ 18; *see also* Pls.' 56.1 at 3 ¶ 19.)

When Plaintiff and Rivera returned to Lot 1, the boot was still attached to her vehicle.

(Pls.' 56.1 at 4 ¶ 21.) Officer Aponte was the only HHC Officer in Lot 1 at that time, but he was placing tickets and boots on other vehicles. (Defs.' 56.1 ¶ 21.) Plaintiff and Rivera approached Officer Aponte, who was standing near a Ford sport utility vehicle that was visibly identified as belonging to the HHC police. (*Id.* ¶ 8.)

After approaching Officer Aponte, Plaintiff asked him why the boot remained on her vehicle. (Pls.' 56.1 at 4 ¶ 23.) Plaintiff alleges that Officer Aponte cursed at her and told her that he was delaying the removal of the boot because Rivera had called him an idiot. (*Id.* at 4 ¶ 24.) Following that response, Plaintiff demanded Officer Aponte's name three times. (*Id.* at 4-5 ¶¶ 22, 30.) He refused to provide it, stating that "I don't have one." (*Id.* at 4 ¶ 27.) At that point, Plaintiff became "frustrated," "annoyed," and "upset" based on Officer Aponte's failure to respond. (Defs.' 56.1 ¶¶ 24-25.)

In an attempt to determine Officer Aponte's name, Plaintiff then reached into the police vehicle through the passenger side window and picked up a clipboard that was laying on the passenger seat. (*Id.* ¶¶ 26, 28.) Officer Aponte "launched" toward Plaintiff and "grab[bed]" the clipboard from her hands. (*Id.* ¶ 28.) While doing so, Office Aponte's jacket "brushed" Plaintiff's face but she was not injured. (*Id.* ¶¶ 29-31.)

While Plaintiff was arguing with Officer Aponte about his identity, Officer Rosario arrived at Lot 1 in a separate police vehicle. (*Id.* ¶ 32; *see also* Scharfstein Decl. Ex. H at 108, 115, 119-21.) Officer Rosario testified that he saw Plaintiff reach into Officer Aponte's vehicle. (Defs.' 56.1 ¶ 32; *see also*

3

Norins Decl. Ex. 7, Tr. Excerpts from Pl.'s April 11, 2007 and Oct. 11, 2007 Deps. ("Pl.'s Dep.") at 30:10-11.)[3]  When Officer Rosario arrived at the scene, Plaintiff heard him say to Officer Aponte, "[s]he hit you.  Remember, she hit you."  (Pls.' 56.1 at 6-7 ¶¶ 48, 49; *see also* Norins Decl. Ex. 9, Deposition of Maria Rivera ("Rivera Dep.") at 111:21-22, 112:8.)  Plaintiff denies striking Officer Aponte.  (Pls.' 56.1 at 6 ¶ 42.)

Following the altercation, Plaintiff left Lot 1 and proceeded to the lobby of Building 1 of the Jacobi Medical Center ("Building 1") in order to report the incident to the Officers' supervisor. (Pls.' 56.1 at 6 ¶ 43; Defs.' 56.1 ¶ 34.)  Rivera remained in Lot 1 within earshot of Officers Aponte and Rosario. (Rivera Dep. at 111:10-24.)  Rivera observed that Officer Rosario was "all hyped up."  (*Id.*)  Officer Aponte then contacted his supervisor, Lieutenant John Arceo ("Lieutenant Arceo"). (Defs.' 56.1 ¶ 35.)  Lieutenant Arceo arrived at Lot 1 just after Plaintiff left the area.  (*Id.* ¶ 36.)

Based on the description of the incident by Officers Aponte and Rosario, Lieutenant Arceo directed via radio that Plaintiff be arrested.  (*Id.* ¶ 37.)  Rivera, who was still in Lot 1, approached Lieutenant Arceo and asked why Plaintiff was being arrested. (Rivera Dep. at 114:4-8.)  Lieutenant Arceo responded to Rivera, in substance, that Plaintiff was being arrested for assaulting an officer.  (*Id.* at 114:6.)  Rivera also testified that Officer Rosario approached her and threatened to arrest her as well.  (*Id.* at 114:7-8.)

### 3.  Plaintiff's Arrest

After leaving Lot 1, Plaintiff walked to Building 1 and "began to make a complaint about Officer Aponte's conduct."  (Pls.' 56.1 at 8 ¶ 65.)  After Lieutenant Arceo directed that Plaintiff be arrested via radio from Lot 1, he and Officers Aponte and Rosario also went to the lobby of Building 1.  (Defs.' 56.1 ¶¶ 39-40; Pls.' 56.1 at 8 ¶ 63.)

When Lieutenant Arceo arrived at Lobby 1, he identified Plaintiff and again ordered that she be arrested.  (Pls.' 56.1 at 9 ¶ 70.)  There were approximately five or six HHC officers present in the lobby, who then told Plaintiff that she was being arrested.  (Defs.' 56.1 ¶¶ 40-41.)  When Plaintiff was told that she would be handcuffed, she became "enraged."  (Defs.' 56.1 ¶ 42.)

Officer Rosario handcuffed Plaintiff.  (*Id.* ¶ 41.)  Plaintiff asked Officer Rosario to loosen the handcuffs because they were "digging" into her skin and she had high blood pressure.  (Pls.' 56.1 at 9 ¶¶ 78, 80.)  In response, the handcuffs "were loosening [sic] but not enough."  (Scharfstein Decl. Ex. V at 3.)

Plaintiff was then escorted out of the lobby and transported in a police vehicle by Officer Rosario and another HHC Officer to the HHC Police Roll Call Office ("HHC Roll Call Office") in Building 5 of the Jacobi Medical Center.  (Defs.' 56.1 ¶ 47; Pls.' 56.1 at 10 ¶ 82.)  During the ride, Plaintiff again

---

[3]   Both parties submitted excerpts of Plaintiff's deposition testimony in connection with Defendants' motion.  (Norins Decl. Ex. 7; Scharfstein Decl. Ex. D.)  For purposes of simplicity, the Court cites directly to the deposition transcripts submitted by the parties rather than to the parties' declarations.

asked the officers to loosen the handcuffs. (Pl.'s Dep. at 223:8-11.) The officers declined to do so while they were in the car. (*Id.*) However, they drove to Building 5 "quickly" (*id.* at 224:7), and the handcuffs were removed when Plaintiff arrived (Defs.' 56.1 ¶ 48).

Inside Building 5, Lieutenant Arceo confiscated Plaintiff's HHC identification and told Plaintiff that she was being "suspended." (Pls.' 56.1 at 12 ¶ 99.) At Lieutenant Arceo's instruction, Plaintiff was also issued one summons for harassment and one for disorderly conduct. (Defs.' 56.1 ¶ 49.) The harassment summons alleged that, while Officer Aponte was "conducting parking enforcement duties," Plaintiff became "agitated, verbally abusive, [and] entered the hospital police vehicle without authorization[,] grabbing [Officer Aponte's] paperwork." (Scharfstein Decl. Ex. T at 2.) Specifically, the summons alleged further that, "when [Officer Aponte] attempted to retrieve said paperwork, [Plaintiff] struck [Officer Aponte] to [the] face area [with] open hand causing an abrasion under the left side of [his] nose." (*Id.*)

The disorderly conduct summons related to allegations regarding Plaintiff's behavior while she was being arrested in the lobby of Building 1. The summons alleged that "when [Plaintiff] was informed she was being place[d] under arrest for harassment, [Plaintiff] intentionally caused public alarm by being loud and engaging in threatening behavior while refusing to be handcuffed in the Jacobi Medical Center main lobby." (*Id.* Ex. U at 2.)

Officer Aponte signed both summonses as the complaining officer. (*See* Scharfstein Decl. Exs. T, U.) The documents directed Plaintiff to appear at the Criminal Part, New York State Supreme Court, Bronx County, on May 9, 2005. (Pls.' 56.1 at 12 ¶ 99.) Plaintiff refused to sign or acknowledge the summonses, and she was released after having been in Building 5 for approximately thirty to forty-five minutes. (Defs.' 56.1 ¶¶ 53, 55.) After her release, Plaintiff attempted to file a complaint at the 49th Precinct of the New York Police Department ("NYPD"), but was told that the NYPD lacked jurisdiction over matters relating to the HHC Police. (Defs.' 56.1 ¶ 56; Pls.' 56.1 at 21 ¶ 56.) Plaintiff then drove Rivera to Dewey Avenue in the Bronx, and dropped her off at approximately 7:00 p.m. (Defs.' 56.1 ¶ 57.)

4. Plaintiff's Medical Treatment

Plaintiff neither requested nor otherwise sought medical treatment on April 1, 2005. (*Id.* 56.1 ¶ 59.) On April 2, 2005, the day after her arrest, Plaintiff went to the North Central Bronx Hospital. (Pls.' 56.1 at 12 ¶ 104.) She described pain in her shoulder, neck, and back, as well as "red-marked wrists." (*Id.*) Although Plaintiff also referred to bruising and swelling in her deposition, medical records from her treatment that day do not reflect such injuries. (*See* Norins Decl. Ex. 16.) Rather, the treating doctor observed tenderness in Plaintiff's deltoid and shoulder joint, with a slightly decreased range of motion. (*Id.* at 3.) With respect to Plaintiff's wrists, the physician noted "circumferential erythema" — that is, red marks due to capillary congestion — but no swelling or abrasions, and full range of motion. (*Id.*)

5

Plaintiff declined prescription pain medication from the doctors, and instead took Motrin, an over-the-counter pain reliever. (*Id.* at 12 ¶ 105.) These symptoms lasted "a couple of days following her arrest." (*Id.* at 12 ¶ 106.)

### 5. HHC Disciplinary Proceedings

In an April 2, 2005 memorandum to the Assistant Director of the HHC Police, Lieutenant Arceo recommended that both Plaintiff and Rivera be referred to HHC's Labor Relations Department for disciplinary action relating to the events on April 1, 2005. (Norins Decl. Ex. 6.) Disciplinary proceedings were initiated against Plaintiff, and she was initially suspended without pay for thirty days between April 5, 2005 until May 5, 2005. (Defs.' 56.1 ¶¶ 66-67.)

On May 3, 2005, HHC issued to Plaintiff a "Provisional Employee Notice and Statement of Charges." (Scharfstein Decl. Ex. X.) HHC charged Plaintiff with unprofessional and threatening behavior, as well as assaulting Officer Aponte. (*Id.*) The May 3, 2005 notice indicated that, pursuant to Plaintiff's collective bargaining agreement, a "Step 1(A) Disciplinary" Conference would be conducted. (*Id.*)

The "Step 1(A)" Conference was held on May 12, 2005. (Defs.' 56.1 ¶ 70.) On August 30, 2005, the hearing officer who presided over the conference issued a written decision finding in HHC's favor with respect to all but one of the disciplinary charges against Plaintiff, which related to Plaintiff's alleged use of profanity in the lobby of Building 1 during her arrest. (*Id.*; Scharfstein Decl. Ex. Y.) The August 30, 2005 decision

recommended a ten-day suspension without pay. (Scharfstein Decl. Ex. Y.) In light of that decision, and because Plaintiff had already served a thirty-day unpaid suspension, she was reimbursed for the other twenty days of the prior suspension. (*See* Defs.' 56.1 ¶ 68.) However, Plaintiff did not receive the reimbursement until February 2007. (Pls.' 56.1 at 22 ¶ 68.)

Plaintiff appealed the hearing officer's decision under the terms of her collective bargaining agreement. (Defs.' 56.1 ¶ 72.) On November 22, 2005, a "Step 2 Review" Conference was conducted by an HHC review officer at HHC's central office. (*Id.* ¶ 73.) On March 5, 2006, the review officer issued a written decision upholding most of the hearing officer's August 30, 2005 decision, except that he reinstated the charge that had previously been dismissed. (Scharfstein Ex. CC.) Following the March 5, 2006 decision, Plaintiff declined to pursue further appeals and accepted the ten-day unpaid suspension. (Pls.' 56.1 at 15 ¶ 127; Defs' 56.1 ¶ 79.)

### 6. Plaintiff's Criminal Proceedings

On May 9, 2005, Plaintiff appeared with counsel at the New York State Supreme Court, Bronx County, for a hearing relating to her April 1, 2005 summonses. (Pls.' 56.1 at 13 ¶ 112.) The charges of harassment and disorderly conduct were both dismissed on that day. (*Id.* at 14 ¶ 113.)

### B. Procedural History

On July 8, 2005, approximately one month after the criminal charges were dismissed, Plaintiff commenced this action. (Doc. No. 1.) The matter was initially

assigned to the Honorable Kenneth M. Karas, District Judge. On August 29, 2005, Defendants filed an Answer. (Doc. No. 6.)

On March 14, 2007, pursuant to a stipulation by the parties, Judge Karas ordered the dismissal of Plaintiffs' claims against Defendants Marian Mullins, Jose Diaz, and Leonard Waterman. (Doc. No. 18.)

This matter was reassigned to the undersigned on September 4, 2007. (Doc. No. 29.) Following the completion of a lengthy discovery process, Defendants filed their motion for summary judgment on January 24, 2008. (Doc. No. 47.)

## II. LEGAL STANDARDS

### A. Summary Judgment

In a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008).

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.

2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

> Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.

*Global Aerospace, Inc. v. Hartford Fire Ins. Co.*, No. 06 Civ. 7104 (LAK), 2009 WL 89122, at *5 (S.D.N.Y. Jan. 13, 2009).

### B. Section 1983

"'Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere.'" *Williams v. City of New York*, No. 07 Civ. 3764 (RJS), 2008 WL 3247813, at *2 (S.D.N.Y. Aug. 7, 2008) (quoting *Duamutef v. Morris*, 956 F. Supp. 1112, 1115 (S.D.N.Y. 1997)). "To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States] (2) by a person acting under the color of state law." *Id.* For the purpose of the analysis that follows, the Court assumes that Defendants acted under color of state law and focuses on the question of whether Plaintiff suffered a constitutional harm that is cognizable under section 1983.

### III. DISCUSSION

Plaintiff's federal claims are brought under section 1983 for false arrest, excessive force, malicious prosecution, malicious abuse of process, civil conspiracy, First Amendment retaliation, and municipal liability against HHC under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Plaintiff also brings several state law claims, many of which parallel her claims under section 1983.

Defendants move for summary judgment as to each claim in the Complaint. The Court discusses each of Plaintiff's federal claims in turn. For the reasons set forth below, Defendants' motion is granted as to each of the federal claims, as well as the state law claims for false arrest and malicious abuse of process.

### A. False Arrest

Plaintiff brings claims for false arrest under New York State law and section 1983. (Compl. ¶¶ 42, 47.) Defendants argue that the false arrest claims should be dismissed because Plaintiff's April 1, 2005 arrest was supported by probable cause. (Defs.' Mem. at 8.) For the reasons set forth below, the Court agrees, and Defendants' motion for summary judgment is granted as to Plaintiff's false arrest claims under federal and state law.

### 1. Applicable Law

The elements of a false arrest claim under § 1983 are the same as the elements of a false arrest claim under New York State law. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). To prove a false arrest claim, a plaintiff must show that: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified. *See Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991).

Under both New York State law and section 1983, "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest' . . . ." *Weyant*, 101 F.3d at 852 ( *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

Moreover, when defending against a false arrest claim, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see also Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). "'[P]robable cause as to any charge at the time of arrest is sufficient to defeat a false arrest claim as a matter of law.'" *Fredericks v. City of New York*, No. 07 Civ. 3659 (LAK) (JCF), 2008 WL 506326, at *4 (S.D.N.Y. Feb. 25, 2008) (quoting *Davenport v. County of Suffolk*, No. 99 Civ. 3088 (JFB), 2007 WL 608125, at *5 (E.D.N.Y. Feb. 23, 2007)). However, "[w]here the defense of probable cause is based on conflicting evidence, the question is resolved by the jury." *Wu v. City of New York*, 934 F. Supp. 581, 588 (S.D.N.Y. 1996).

2. Analysis

Defendants argue that summary judgment in their favor on Plaintiff's false arrest claim is appropriate because, under *Devenpeck v. Alford*, 534 U.S. at 153, there was probable cause to arrest Plaintiff for, *inter alia*, obstructing governmental administration under the New York State Penal Law. (Defs.' Mem. at 8.) Plaintiff argues that the Court's inquiry is limited to the crimes listed in the summonses Plaintiff received, and that, in any event, no probable cause existed on April 1, 2005 to arrest Plaintiff for *any* crimes. (Pls.' Mem. at 5-10.)

Plaintiff first argues that "the only offenses relevant to the probable cause analysis are harassment and disorderly conduct." (Pls.' Mem. at 6.) Simply put, this is a misstatement of the law. "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . *it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer* at the time of arrest." *Jaegly*, 439 F.3d at 154 (emphasis added); *see also Espada v. Schneider*, 522 F. Supp. 2d 544, 552 (S.D.N.Y. 2007) (granting summary judgment in favor of the defendants on a false arrest claim where the plaintiff was arrested for felony assault on a police officer but there was, "at minimum," probable cause to believe that the plaintiff had committed disorderly conduct). Thus, contrary to Plaintiff's argument, the Court must look to whether probable cause existed to arrest Plaintiff for *any* crime, irrespective of the crimes with which she was ultimately charged.

Defendants assert that there was probable cause to arrest Plaintiff for, *inter alia*, the crime of obstructing governmental administration. (Defs.' Mem. at 8.) Under New York Law, a person is guilty of obstructing governmental administration if he or she "prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . ." N.Y. Penal Law § 195.05; *cf. People v. Case*, 42 N.Y.2d 98, 102 (N.Y. 1977) ("Within the scope of § 195.05 are such cases as . . . *tampering with a motor vehicle* of a housing inspector . . . ." (emphasis added)).

It is undisputed that Plaintiff violated HHC parking regulations by failing to display properly a valid parking sticker, and that it was therefore appropriate for Officer Aponte to place a boot on the vehicle. (Defs.' 56.1 ¶¶ 6, 7.) It is likewise undisputed that, when Plaintiff and Rivera returned to Lot 1 after completing the paperwork to have the boot removed, Officer Aponte had moved out of the vicinity of Plaintiff's vehicle and was performing his duties elsewhere in Lot 1 by writing tickets and "booting other vehicles." (*Id.* ¶ 21).

When Plaintiff discovered that the boot had not been removed, she demanded Officer Aponte's name and became, in her words, "frustrated," "annoyed," and "upset," when he did not provide it to her. (*Id.* ¶¶ 24-25.) At that time, Plaintiff admits that she reached into the passenger-side window of a clearly marked police vehicle, picked up Officer Aponte's clipboard, and attempted to remove it from the vehicle. (*Id.* ¶¶ 8, 26, 28.)

9

When Officer Aponte saw Plaintiff reach into his police vehicle (*see id.* ¶ 28), his observations made him aware of objective facts "sufficient to warrant a person of reasonable caution in the belief" Plaintiff "[wa]s committing a crime," to wit, obstructing governmental administration. *Weyant*, 101 F.3d at 852. The statute prohibits "an intentional insertion of one's self or one's intentions into steps taken by police officers to fulfill their duties." *People v. Beam*, 866 N.Y.S.2d 564, 567 (N.Y. Sup. Ct. 2008). Plaintiff's intentional and unauthorized entry into Officer Aponte's police vehicle supported a reasonable belief based on objective facts that Plaintiff was "attempt[ing] to prevent [Officer Aponte] from performing an official function, by means of . . . interference . . . ." N.Y. Penal Law § 195.05. When Plaintiff crossed the line between verbally expressing frustration with Officer Aponte's approach to the situation and objectively manifesting that frustration by entering his police vehicle, her actions gave rise to probable cause for her arrest.

Plaintiff devotes little time to contesting these objective facts. Rather, Plaintiff asserts that she lacked the requisite *mens rea* to commit obstructing governmental administration. (Pls.' Mem. at 9.) However, "[t]he existence of probable cause is determined objectively — the officer's subjective belief at the time of arrest is irrelevant — based on the totality of the circumstances." *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d 387, 394 (S.D.N.Y. 2007) (citing *Illinois v. Gates*, 462 U.S. 213, 230-32 (1983)). Moreover, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to

explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)); *see also Rodriguez v. City of New York*, 535 F. Supp. 2d 436, 442 (S.D.N.Y. 2008) (noting the officer "was not required to make a full investigation into plaintiff[s'] state of mind" because "[o]nce plaintiffs pushed [the officer], a person of reasonable caution could have believed that plaintiffs had committed a crime"). Even if, as Plaintiff argues, Officer Aponte "knew plaintiff's intent . . . was to obtain his name" when she entered his vehicle (Pls.' Mem. at 10), it is Officer Aponte's objective observation of Plaintiff's actions, rather than the purpose for which those acts were undertaken, that governs the probable cause inquiry.

Therefore, in sum, the relevant facts are undisputed, and the Court concludes that Plaintiff's conduct on April 1, 2005 gave rise to probable cause for her arrest. Because probable cause is a "complete defense to an action for false arrest" under both New York State law and section 1983, *Weyant*, 101 F.3d at 852, summary judgment is appropriate in Defendants' favor. Accordingly, Plaintiff's false arrest claims under New York State and federal law are dismissed.

## B. Excessive Force

Plaintiff brings a claim for excessive force under section 1983, alleging that Officer Rosario handcuffed her too tightly following her arrest. (Compl. ¶ 42(b); *see also* Pls.' Mem. at 24.) With respect to this claim, Defendants argue that Plaintiff's injuries were *de minimis* and did not rise to the level of a

10

Fourth Amendment violation. (Defs.' Mem. at 15-17.) For the reasons stated below, Defendants' motion is granted as to Plaintiff's excessive force claim under section 1983.

### 1. Applicable Law

For an excessive force claim "to rise to the level of constitutional violations cognizable pursuant to § 1983, the plaintiff must show that the force used was objectively unreasonable under the Fourth Amendment." *Black v. Town of Harrison*, No. 02 Civ. 2097 (RWS), 2002 WL 31002824, at *5 (S.D.N.Y. Sept. 5, 2002) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001). "*Graham* sets forth a list of factors that courts should consider when analyzing excessive force claims, 'requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Johnson v. City of New York*, No. 05 Civ. 7519 (PKC), 2008 WL 4450270, at *4 (S.D.N.Y. Sept. 29, 2008) (quoting *Graham*, 490 U.S. at 306).

### 2. Analysis

Plaintiff's excessive force claims focus almost exclusively on Officer Rosario. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (quoting *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).

Accordingly, because Plaintiff has not alleged that any other Defendant used excessive force during her arrest, Plaintiff's excessive force claims are dismissed as to all Defendants other than Officer Rosario.[4]

With respect to Plaintiff's allegations regarding Officer Rosario, the Court's analysis proceeds in two parts. First, the Court examines whether Plaintiff has produced sufficient evidence to support an excessive force claim based on the general manner in which she was arrested. Second, the Court addresses Plaintiff's more specific excessive force claim based on tight handcuffing.

Beginning with the broader inquiry, the cases upon which Plaintiff principally relies

---

[4]   Although Plaintiff argues that Lieutenant Arceo should be subject to supervisory liability for plaintiff's arrest (Pls.' Mem. at 11) — a contention that the Court need not address in light of its conclusion that Plaintiff's arrest was supported by probable cause — Plaintiff presents no arguments for supervisory liability in relation to her excessive force claim. The Court independently finds that the record does not support a claim for supervisory liability with respect to Plaintiff's excessive force claim. *See Ziemba v. Armstrong*, 430 F.3d 623, 625 (2d Cir. 2005) (noting that supervisory liability attaches only upon a showing of "deliberate indifference to what was going on (by failing to act on information indicating unconstitutional acts were occurring) or . . . gross[] negligen[ce] in failing to supervise the subordinates"). As discussed *infra*, Plaintiff's handcuffs were removed upon her arrival at the HHC Roll Call Office, which was the first time that Lieutenant Arceo would have had an opportunity to become aware of any alleged constitutional violation relating to Officer Rosario's use of handcuffs. Accordingly, to the extent Plaintiff seeks to bring a claim for supervisory liability against Lieutenant Arceo in connection with her excessive force claim, Defendants' motion for summary judgment as to that claim is granted.

focus on the general manner in which the police officers conducted the custodial arrests at issue.[5]   (*See* Pls.' Mem. at 24 (citing *Johnson v. City of New York*, No. 05 Civ. 2357 (SHS), 2006 WL 2354815, at *5 (S.D.N.Y. Aug. 14, 2006) and *Stokes v. City of New York*, No. 05 Civ. 0007 (JFB) (MDG), 2007 WL 1300983, at *10-11 (E.D.N.Y. May 3, 2007))).   In *Stokes*, for example, the court noted that the plaintiff's claim was "in essence, based on the argument that the entry into the apartment to execute the arrest was illegal and, therefore, any force during the arrest is *per se* excessive."  *Stokes*, 2007 WL 1300983, at *10-11.   However, Plaintiff has not produced evidence to support an excessive force claim based on this broader inquiry regarding the general manner in which Officer Rosario effected her arrest.

One of the more recent cases from the Second Circuit on this issue, which is cited in both *Johnson* and *Stokes*, is *Maxwell v. City of New York*, 380 F.3d 106 (2d Cir. 2004).   In *Maxwell*, the plaintiff alleged that the defendant officer "violently and unnecessarily swung and jerked her around by the handcuffs" and "shoved her head first into his police car, causing her head to strike the metal partition between the front and back seats."  *Id.* at 108.  The plaintiff was initially treated for a headache, as well as "pain in her lower back and left arm . . . ."  *Id.*  She experienced symptoms for weeks, which included "headaches, dizziness, nausea, and lethargy."  *Id.*  The plaintiff in *Maxwell* was also later diagnosed with "post-concussive syndrome."  *Id.*   The district court granted summary judgment in favor of defendants, and the Second Circuit reversed that decision.  *Id.*

Reviewing the case law, the *Maxwell* court cited *Robison v. Via*, 821 F.2d 913, 924-25 (2d Cir. 1987), for the proposition that "we have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising . . . ."  *Maxwell*, 380 F.3d at 108.   In reversing the grant of summary judgment, the *Maxwell* court held that, "in light of *Robison*," and based on the plaintiff's post-concussive syndrome diagnosis, "a jury should assess Maxwell's account of *what occurred during her arrest* . . ."  *Id.* at 109-10 (emphasis added).

Unlike in *Maxwell*, in this case, Plaintiff's symptoms lasted "a couple of days" rather than weeks, and Plaintiff was not diagnosed with an injury as severe as a concussion.  The *Maxwell* court emphasized the manner in which the plaintiff's alleged injuries were inflicted during the arrest.  The court did not focus solely on the fact that handcuffs were

---

[5]   Plaintiff also cites two cases analyzing excessive force claims in the context of a motion to dismiss, where the truth of the plaintiff's allegations is assumed.  (Pls.' Mem. at 23-24 (citing *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999) (dismissing excessive force claim *sua sponte*) and *Golio v. City of White Plains*, 459 F. Supp. 2d 259, 265 (S.D.N.Y. 2006) (holding that officer is not entitled to qualified immunity on a motion to dismiss where handcuffs caused visible redness and swelling and officer ignored the plaintiff's "repeated cries of pain" for more than two hours))).  Although Defendants bear the burden of showing that they are entitled to summary judgment, Plaintiff, who would bear the burden of proof at trial, "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2009 WL 458624, at *2 (S.D.N.Y. Feb. 25, 2009).  For the reasons set forth by the Court *infra*, Plaintiff has not done so.

used, and the injuries emphasized in the decision did not directly result from the handcuffs.

The *Maxwell* court's analysis, as well as its reliance on *Robison*, reinforces the requirement that courts must look to the totality of the circumstances relating to the conduct of law enforcement officers when assessing an excessive force claim under section 1983. *See Maxwell*, 380 F.3d at 108; *see also Graham*, 490 U.S. at 397. Thus, contrary to Plaintiff's argument, neither *Maxwell* nor *Robison* stand for the proposition that complaints of pain, bruising, and swelling are alone sufficient to preclude summary judgment in an excessive force claim based solely on tight handcuffing.

Turning to the overall circumstances surrounding Plaintiff's arrest, Plaintiff concedes that her behavior became increasingly erratic during her interaction with Defendants. In Lot 1 prior to her arrest, she became "frustrated," "annoyed," and "upset." (Defs.' 56.1 ¶¶ 24-25.) She also admits that she reached into a marked police vehicle without authorization to do so. (Defs.' 56.1 ¶¶ 26, 28). Finally, when Plaintiff learned that she was going to be arrested, she became more upset and "enraged." (Scharfstein Decl. Ex. V at 2.)

It is undisputed that Officer Rosario handcuffed Plaintiff when he effected her arrest. (Defs.' 56.1 ¶ 51.) Under these circumstances, however, that act, in and of itself, was not unreasonable. *See Grant v. City of New York*, 500 F. Supp. 2d 211, 217 (S.D.N.Y. 2007) ("'Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to

prevent the arrestee's hands from slipping out.'" (quoting *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005)). Therefore, in light of Plaintiff's volatile behavior during her encounter with the officers, and because the arrest was supported by probable cause, the Fourth Amendment was not violated when Officer Rosario placed Plaintiff in handcuffs. Moreover, unlike in *Maxwell* or *Robison*, there is no evidence that Officer Rosario "violently and unnecessarily swung" Plaintiff, "jerked her around by the handcuffs," "twisted her arm," or "yanked" her. Accordingly, based on the undisputed facts in the record, Plaintiff has produced insufficient evidence to support an excessive force claim based on the overall manner in which her arrest was conducted.

However, Plaintiff also contends that Defendant Rosario handcuffed her too tightly, and she alleges that the handcuffs caused her pain, swelling, and red marks on her wrists. In order to address this more specific type of excessive force claim relating to tight handcuffing, the Court looks to whether "1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (citing *Esmont*, 371 F. Supp. 2d at 215). When considering these factors, "[t]he 'question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (quoting *Graham*, 490 U.S. at 397).

With respect to the first factor, Plaintiff's deposition testimony is sufficient to permit a factfinder to conclude that the handcuffs were, at least initially, "unreasonably too tight," *Lynch*, 567 F. Supp. 2d at 468.   Thus, the Court must look to whether Plaintiff's complaints regarding the handcuffs were ignored, and whether Plaintiff suffered injuries that implicate the Fourth Amendment.

It is undisputed that Plaintiff complained about the tightness of the handcuffs twice. She did so in the lobby of Building 1 when Officer Rosario initially put them on her, and again while she was being transported to the HHC Roll Call Office. (Pls.' 56.1 at 9 ¶¶ 78, 80; Pl.'s Dep. at 223:8-11.)   Although Plaintiff maintains that the tightness was not alleviated after her first complaint, she admits that she was not wholly ignored. (*See* Compl. ¶ 29 (alleging that Officer Rosario "made a motion of loosening the handcuffs," but that the handcuffs were not sufficiently loosened).)   Rather, Plaintiff's notes regarding the arrest state that the handcuffs "were loosening [sic] but not enough." (Scharfstein Decl. Ex. V at 3.)[6]   Thus, Plaintiff's first

complaint regarding the handcuffs was not ignored by Officer Rosario.

According to Plaintiff's narrative of these events, she did not renew her complaint about the tightness of the handcuffs until she was being transported to the HHC Roll Call Office. (Pl.'s Dep. at 223:8-11, 224:7.) Plaintiff also acknowledges that the handcuffs were removed when she arrived at the HHC Roll Call Office. (*Id.*)   According to Plaintiff's recollection, the ride from the lobby of Building 1 to the HHC Roll Call Office was "quick[]." (*Id.* at 224:7.) Therefore, the Fourth Amendment did not require the officers to pull over their vehicle to adjust her handcuffs during the trip under these circumstances.

Turning to the evidence of injuries from the handcuffing, Plaintiff testified that she suffered pain in her shoulder, neck, and back, as well as bruises, swelling, and "red-marked wrists." (Pls.' 56.1 at 12 ¶ 104.)   Although the events that allegedly caused these injuries took place at the Jacobi Medical Center, Plaintiff did not seek treatment at that facility on April 1, 2005. (Defs.' 56.1 ¶ 59.)   On the morning of April 2, 2005, Plaintiff went to the North Central Bronx Hospital. (*Id.*)   The treating physician did not observe bruises or swelling. (*See* Norins Decl. Ex. 16.)   There is no evidence that Plaintiff sought additional treatment.   She was treated with an over-the-counter pain reliever, and the pain only lasted "a couple of days following her arrest." (*Id.* at 12 ¶ 106.)

Plaintiff's alleged injuries do not suggest that an unconstitutional amount of force was

---

[6]   At Plaintiff's May 31, 2007 deposition, Plaintiff disclosed that she had created a document on April 2, 2005 to memorialize her recollection of the events on April 1, 2005.   Although this document was directly responsive to Defendants' discovery requests, Plaintiff failed to produce it or assert a claim of privilege.   Thus, in an order dated June 19, 2007, the Honorable Debra Freeman, Magistrate Judge, ordered that the document be produced to Defendants. (Doc. No. 25.)   On January 14, 2008, Plaintiff submitted an affidavit stating that the typed document was created on April 2, 2005, and that the handwritten notes prepared in connection with that document had been discarded.   The document bears Plaintiff's April 2, 2005 signature, and the statements contained therein are admissible against Plaintiff as admissions of a party opponent.   *See* Fed. R. Evid.

802(d)(2)(B).

used to effect her arrest under the Fourth Amendment and section 1983. *See Rincon v. City of New York*, No. 03 Civ. 8276 (LAP), 2005 WL 646080, at *2 (S.D.N.Y. Mar. 21, 2005). In *Rincon*, police officers entered the plaintiff's apartment pursuant to a "no-knock" search warrant related to a narcotics investigation. *Id.* at *2. The plaintiff submitted an affidavit stating, in substance, that "officers dragged [her] into her living room, threw her on the floor, and handcuffed her to a battering ram." *Id.* at *1. The officers' efforts to restrain the plaintiff caused previously existing stitches on her leg to rupture, and her leg began to bleed. *Id.* The plaintiff remained handcuffed for between ninety minutes and four hours. *Id.* at *1-2. The search failed to uncover evidence of narcotics, and the plaintiff was "[s]ubsequently . . . treated at a nearby hospital for swelling of the right leg and wrist." *Id.* at *2. With respect to the plaintiff's excessive force claim, the court held that the plaintiff's allegations were *de minimis* "and simply [did] not amount to a constitutional violation." *Id.* at *5.

Although the type of criminal activity being investigated in *Rincon* — narcotics transactions — is potentially distinguishable from the offenses for which Plaintiff was arrested — assaulting an officer and disorderly conduct — the relevant issue is whether the injuries claimed by Plaintiff are sufficient to permit a jury to conclude that a Fourth Amendment violation occurred. The force used by the officers in *Rincon* caused an existing wound on the plaintiff's leg to re-open, which resulted in bleeding. Plaintiff complains of no injury of that magnitude here. The plaintiff in *Rincon* also experienced swelling in her wrists resulting from the

handcuffing, which is nearly identical to the undocumented injury Plaintiff claims to have suffered. Moreover, as in *Rincon*, Plaintiff sought treatment at a local hospital, and there is no record evidence of diagnosed injuries other than pain in Plaintiff's wrists and shoulders, which she admits lasted only "a couple of days."

These circumstances are insufficient to sustain an excessive force claim under the Fourth Amendment. *See Lynch*, 567 F. Supp. at 468 ("[T]he fact that the tight handcuffing did not cause [the plaintiff] any continuing injury is fatal to the excessive force claim."); *cf. Bratton v. New York State Div. of Parole*, No. 05 Civ. 950 (NAM), 2008 WL 1766744, at *9-10 (N.D.N.Y. Apr. 14, 2008) (granting summary judgment in favor of the defendants despite medical records from prison facility indicating that swelling, tenderness, and bruising resulted from the application of handcuffs); *Esmont*, 371 F. Supp. 2d at 213 (dismissing excessive force claim relating to tight handcuffing where the plaintiff failed to request that handcuffs be loosened, despite evidence that handcuffing resulted in bruising and swelling that required the plaintiff to be placed in a "half cast" for one week). Thus, based on the undisputed facts surrounding Plaintiff's arrest, and taking into account the evidence produced by Plaintiff relating to physical effects of the handcuffing, no reasonable jury could conclude that Plaintiff suffered a Fourth Amendment harm with respect to her excessive force claim.

"Physical force is often necessary when effectuating arrests or executing search warrants and, thus, 'not every push or shove' is unconstitutionally excessive, 'even if it may later seem unnecessary in the peace of a

judge's chambers.'" *Stokes*, 2007 WL 1300983, at *10 (quoting *Maxwell*, 370 F.3d at 108). The Court has already determined that Plaintiff's arrest was supported by probable cause, and the Court now holds that the force used in effecting Plaintiff's arrest was not constitutionally unreasonable under the Fourth Amendment. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's excessive force claim under section 1983.

### C. Malicious Prosecution

Plaintiff brings claims for malicious prosecution under state and federal law. (Compl. ¶¶ 42(f), 47.) In their motion for summary judgment, Defendants argue that Plaintiff's malicious prosecution claims must be dismissed because no post-arrangement seizure occurred. (Defs.' Mem. at 11-12.) For the reasons stated below, the Court grants Defendants' motion as to Plaintiff's malicious prosecution claim under section 1983 because, based on the undisputed facts regarding the criminal proceedings that were instituted against her, no constitutional harm occurred.

### 1. Applicable Law

"To prevail on a § 1983 malicious prosecution claim, a plaintiff must establish the elements of malicious prosecution under state law, and then show that his Fourth Amendment rights were violated after legal proceedings were initiated." *Douglas v. City of New York*, No. 06 Civ. 6134 (DC), 2009 WL 260769, at *6 (S.D.N.Y. Feb. 5, 2009). A malicious prosecution claim under New York State law has four elements: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (internal citations omitted).

The Fourth Amendment component of a section 1983 claim based on malicious prosecution requires that there "be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995)).

### 2. Analysis

Plaintiff argues that the issuance of the summonses, combined with one criminal court appearance, constituted a Fourth Amendment seizure. (Pls.' Mem. at 20-22.) In support of this argument, Plaintiff seeks to distinguish several cases in this District holding to the contrary. The Court is unpersuaded.

"[A] pre-arraignment summons does not constitute a seizure when evaluating a malicious prosecution claim[]," and "[a] § 1983 malicious prosecution claim requires more than a 'single court appearance' to constitute a deprivation of liberty." *Wang v. City of New York*, Nos. 05 Civ. 4679 (AKH) and 05 Civ. 5943 (AKH), 2008 WL 2600663, at *4 (S.D.N.Y. June 26, 2008); *see also Bissinger v. City of New York*, No. 06 Civ. 2325-26 (WHP), 2007 WL 2826756, at *6-8 (S.D.N.Y. Sept. 24, 2007); *Garrett v. Port*

*Auth. of N.Y. & N.J.*, No. 04 Civ. 7368 (DC), 2006 WL 2266298, at *7 (S.D.N.Y. Aug. 8, 2006); *Porat v. Lincoln Towers Cmty. Assoc.*, No. 04 Civ. 3199 (LAP), 2005 WL 646093, at *3 (S.D.N.Y. Mar. 21, 2005); *Katzev v. Newman*, No. 96 Civ. 9138 (BSJ), 2000 WL 23229, at *4 (S.D.N.Y. Jan. 12, 2000). Plaintiff received summonses from Defendants on the night of April 1, 2005. (Defs.' 56.1 ¶ 49.) She appeared in the Criminal Part, New York State Supreme Court, Bronx County, on May 9, 2005. (*Id.* ¶¶ 61-62.) The charges were dismissed on that day. (*Id.*) The single court appearance was not a Fourth Amendment "seizure" caused by the initiation of criminal proceedings, and these events cannot support a constitutional claim for malicious prosecution. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's malicious prosecution claim under section 1983.

### D.  Malicious Abuse of Process

Plaintiff also alleges that Defendants violated section 1983 and state law by maliciously abusing the criminal process when Officer Aponte signed the April 1, 2005 summonses. (Pls.' Mem. at 17.) For the reasons stated below, Defendants' motion for summary judgment as to these state and federal claims is granted because, based on the undisputed facts in the record, there is insufficient evidence that Defendants acted with an improper objective after the summonses were issued.

### 1.  Applicable Law

"Procedural due process forbids the use of legal process for a wrongful purpose." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Therefore, a defendant may be liable under section 1983 for malicious abuse of the criminal process. *Savino*, 331 F.3d 63, 76-77 (2d Cir. 2003).

The elements of a malicious abuse of process claim under section 1983 correspond to the elements of the same claim under New York State law. *Cook*, 41 F.3d at 80. "[A] malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.*

"The crux of a malicious abuse of process claim is the collateral objective element." *Douglas*, 2009 WL 260769, at *8. "[T]he collateral objectives typically associated with abuse of criminal process are extortion, blackmail or retribution; and those objectives are usually characterized by personal animus." *Jovanovic v. City of New York*, No. 04 Civ. 8437 (PAC), 2006 WL 2411541, at *12 n.4 (S.D.N.Y. Aug. 17, 2006) (internal quotations omitted).

### 2.  Analysis

Defendants argue that Plaintiff's allegations are insufficient because, in order to sustain a claim for malicious abuse of process, Plaintiff must allege that Defendants pursued an impermissible "collateral objective" *after* the criminal process was initiated. (*See* Defs.' Mem. at 14 (emphasis added).) In response, Plaintiff points to *dicta* in *Parkin v. Cornell University, Inc.*, 78

17

N.Y.2d 523, 530 (N.Y. 1991) stating that "nothing in this Court's holdings would seem to preclude an abuse of process claim based on the issuance of the process itself." (Pls.' Mem. at 18.) However, the New York State Court of Appeals has never so held, and Plaintiff points to no authority from other New York courts that have followed the *dicta* from *Parkin*.

Indeed, after *Parkin* was decided, the Second Circuit stated that: "While malicious prosecution concerns the improper issuance of process, the gist of abuse of process is the improper use of process *after* it is regularly issued." *See Cook*, 41 F.3d at 80 (internal quotations and alterations omitted) (emphasis added). Numerous courts in this District have applied this standard. *See, e.g.*, *Stewart v. City of New York*, No. 06 Civ. 15490 (RMB) (FM), 2008 WL 1699797, at *9 (S.D.N.Y. Apr. 9, 2008); *Jovanovic*, 2006 WL 2411541, at *11; *Krebs v. United States*, No. 98 Civ. 2590 (MBM), 1999 WL 185263, at *5 (S.D.N.Y. Mar. 31, 1999); *Morales v. United States*, 961 F. Supp. 633, 638 (S.D.N.Y. 1997); *Scheiner v. Wallace*, 955 F. Supp. 232, 242 (S.D.N.Y. Feb. 11, 1997); *Brawer v. Carter*, 937 F.Supp. 1071, 1082 (S.D.N.Y. Aug. 29, 1996); *Lopez v. City of New York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995). The Court is bound by the law of the Circuit, and persuaded by the above-cited cases from this District. Accordingly, the *dicta* quoted by Plaintiffs from *Parkin* does not alter the established law governing malicious abuse of process claims.

Plaintiff next points to three pieces of evidence that she argues "constituted continuation of the collateral objective to discredit plaintiff after process had already been issued to her in the form of the two summonses . . . ." (*See* Pls.' Mem. at 18 n.13.) Specifically, Plaintiff argues that Defendants improperly pursued a collateral objective in: (1) the April 1, 2005 incident reports relating to her arrest, (2) the April 5, 2005 memorandum by Lieutenant Arceo that requested that HHC take disciplinary action against Plaintiff, and (3) the May 12, 2005 "Step 1(A) Disciplinary" Conference. (*Id.*)

This evidence does not establish that any Defendant sought to improperly use the legal process *after* the summonses were issued. First, the April 1, 2005 incident reports were created contemporaneously with the summonses, and there is no evidence that they were used in any way at Plaintiff's sole court appearance relating to the charges. Second, and similarly, Lieutenant Arceo's April 5, 2005 memorandum was sent to the Assistant Director of the HHC police force. (*See* Norins Decl. Ex. 6.) The memorandum recommended that proceedings be initiated in HHC's Labor Relations department, and Plaintiff has not argued that the memorandum or its contents were utilized in the criminal proceedings against her. Finally, any evidence relating to the May 12, 2005 "Step 1(A) Disciplinary" Conference is irrelevant to this inquiry because the criminal charges against Plaintiff were dismissed prior to that Conference, on May 9, 2005.

Because Plaintiff has failed to adduce evidence that Defendants improperly sought to pursue a collateral objective after the issuance of the summonses, Defendants' motion for summary judgment is granted. Accordingly, Plaintiff's claims for malicious abuse of process under section 1983 and New York State law are dismissed.

18

### E.  Conspiracy Claims

Plaintiff alleges that Officers Aponte and Rosario conspired to violate Plaintiff's constitutional rights by falsely arresting her in violation of 42 U.S.C. sections 1983, 1985. (Pls.' Mem. at 15; *see also* Compl. ¶¶ 1, 42.) For the reasons stated below, the Court concludes that, because Plaintiff has not established that an unconstitutional false arrest or malicious prosecution occurred, Plaintiff cannot maintain a federal claim based on a conspiracy to violate her constitutional rights.

### 1.  Applicable Law

"[T]o succeed in a § 1983 conspiracy claim, a plaintiff must prove not only a conspiracy, but an actual deprivation of a constitutional right." *D'Angelo-Fenton*, 470 F. Supp. 2d at 397; *see also Bussey v. Phillips*, 419 F. Supp. 2d 569, 586-87 (S.D.N.Y. 2006). "[A]lthough the pleading of a conspiracy will enable a plaintiff to bring suit against purely private individuals, the lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action:  the violation of a federal right." *Singer*, 63 F.3d at 119.

In addition to the violation of a constitutional right, a plaintiff bringing a conspiracy claim under section 1983 must also show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  Conspiracies are "by their very nature secretive operations, and

may have be to proven by circumstantial, rather than direct, evidence." *Id.* at 72. However, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." *Dunlop v. City of New York*, No. 06 Civ. 0433 (RJS), 2008 WL 1970002, at *4 (S.D.N.Y. May 6, 2008).

In a conspiracy claim under section 1985, the plaintiff must prove not only that a conspiracy existed, but also that the conspiracy was "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam) (quoting *United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 829 (1983)).   Therefore, under section 1985, Plaintiff must establish that Defendants acted with racial animus.  *See Younger v. City of New York*, 480 F. Supp. 2d 723, 733-34 (S.D.N.Y. 2007); *Bove v. New York City*, No. 98 Civ. 8800 (HB), 1999 WL 595620, at *5 (S.D.N.Y. Aug. 6, 1999).

### 2.  Analysis

Plaintiff argues that Officers Aponte and Rosario conspired to arrest her without probable cause and initiate false charges against her. (Pls.' Mem. at 15-16.)  However, Plaintiff has failed to establish an underlying constitutional violation, which is a fatal defect in her section 1983 conspiracy claim. Similarly, Plaintiff's section 1985 conspiracy claim fails because she has not produced evidence that any Defendant acted with a discriminatory motive.

First, as condition precedent to her 1983 conspiracy claim, Plaintiff must establish that her constitutional rights were violated in her false arrest and malicious prosecution claims. For the reasons stated above, *see supra* Sections III.A and III.C, Plaintiff has not done so. Thus, because Plaintiff has not produced sufficient evidence that a constitutional violation occurred to survive summary judgment, "there can be no civil rights conspiracy to deprive that right." *Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998). Accordingly, Defendants' motion for summary judgment on Plaintiff's section 1983 conspiracy claim is granted.

Second, with respect to the conspiracy claim under section 1985, Plaintiff must provide evidence that Defendants acted in concert with a racial or discriminatory animus. *See, e.g.*, *Zahrey v. City of New York*, No. 98 Civ. 4546 (DCP) (JCF), 2009 WL 54495, at *32 (S.D.N.Y. Jan. 7, 2009) (citing *Mian*, 7 F.3d at 1087) (alterations in original). Plaintiff has neither alleged nor adduced evidence that any Defendant acted with an intent to discriminate. "A claim of a conspiracy based upon 'unsubstantiated speculation' is insufficient to defeat a motion for summary judgment." *Rodriguez v. City of New York*, No. 05 Civ. 10682 (PKC) (FM), 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114-15 (2d Cir. 1998) and *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 256 (2d Cir. 1984)). Accordingly, Plaintiff's claims under section 1985 are dismissed.[7]

### F. First Amendment Retaliation

Plaintiff alleges that Defendants retaliated against her after she threatened to file a complaint against Officer Aponte. (*See* Compl. ¶ 42.) Based on this allegation, Plaintiff advances two theories of retaliation under the First Amendment and section 1983. First, Plaintiff argues that she was arrested in retaliation for her threat to Officer Aponte that she "was going to report him to a supervisor." (Pls.' Mem. at 26.) Second, Plaintiff argues that she was subjected to adverse employment actions at HHC in response to this threat. (*Id.* at 27.)

The Court concludes that Plaintiff's first argument must fail because her arrest was supported by probable cause, and her "public employee" retaliation theory is likewise unavailing because her allegedly protected speech did not relate to a "matter of public concern." Accordingly, for the reasons stated below, Defendants' motion for summary judgment is granted as to Plaintiff's First Amendment retaliation claims.

### 1. Applicable Law

The elements of a First Amendment retaliation claim depend on the factual context of the underlying allegations. *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir.

---

[7] Similarly, to state a claim under the Equal Protection Clause, Plaintiff must produce evidence of "purposeful discrimination . . . directed at an identifiable or suspect class." *Kramer v. City of New York*, No. 04 Civ. 106 (HB), 2004 WL 2429811, at *5 (S.D.N.Y. Nov. 1, 2004) (citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) and *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)). Although Rivera, Plaintiff's companion on April 1, 2005, used racially derogatory terms during her interaction with Officers Aponte and Rosario (Pls.' 56.1 at 10 ¶¶ 84, 86), there is no evidence of any racial animus being directed toward Plaintiff. Accordingly, Plaintiff's equal protection claims are dismissed.

2008).    To prevail on a First Amendment retaliation claim under section 1983 that relates to an arrest, the plaintiff must prove that: (1) he or she "has an interest protected by the First Amendment"; (2) the defendants' actions "were motivated or substantially caused by his [or her] exercise of that right"; and (3) the defendants' actions "effectively chilled the exercise of his [or her] First Amendment right."    *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (noting that the *Curley* standard governs a claim by "a private citizen who allege[s] that, in retaliation for criticizing the actions of certain public officials, he [or she] was arrested").

However, a different standard governs First Amendment retaliation claims brought by public employees alleging that they were wrongfully subjected to adverse employment actions.    "[I]t is well-settled that public employees alleging retaliation for engaging in protected speech are not normally required to demonstrate a chill subsequent to the adverse action taken against them."    *Gill v. Pidlypchak*, 389 F.3d 379, 382 (2d Cir. 2004).    "Where the plaintiff is a public employee alleging that he suffered an adverse employment action as retaliation for the exercise of his [or her] First Amendment rights," "a plaintiff must initially show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest"; (2) he or she suffered an adverse employment action"; and (3) "the speech was at least a substantial or motivating factor in the [adverse employment action]."    *Morrison*, 429 F.3d at 51; *see also Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).

2. Analysis

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."    *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). Nevertheless, Plaintiff has failed to offer evidence to support either her "private citizen" or "public employee" retaliation claims.

First, Plaintiff cannot recover on the theory that she was arrested in retaliation for engaging in protected speech.    Indeed, "because defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be undertaken." *Curley*, 268 F.3d at 73 (citing *Singer*, 63 F.3d at 120).    The Court has already concluded that, based on the undisputed facts in the record, there was probable cause to arrest Plaintiff on April 1, 2005.    *See supra* Section III.A.    Accordingly, Plaintiff cannot maintain a First Amendment retaliation claim as a private citizen challenging the grounds for her arrest.

Assuming, *arguendo*, that Plaintiff could demonstrate that she was arrested in retaliation for her threat to report Officer Aponte, she does not argue that her speech was chilled or that she was otherwise discouraged from filing a complaint against Officer Aponte.[8]    Indeed, immediately after

---

[8]    The Court finds unpersuasive Plaintiff's argument that she need not show a chilling effect on her speech because her arrest and the issuance of the summonses were a sufficient injury to maintain a First Amendment Claim.    (Pls.' Mem. at 27 & n.18.)    In support of this argument, Plaintiff quotes the following language from *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680 (S.D.N.Y. 2004): "To illustrate by extreme example, if

she was released from the HHC Roll Call Office following her arrest, Plaintiff attempted to file a complaint against Defendants at the NYPD. (Defs.' 56.1 ¶ 56.) Plaintiff also complained about the events to HHC and to her union representatives. (*Id.* ¶¶ 63-65.) Plaintiff's argument that her "arrest, prosecution and suspension from her job . . . had the effect of chilling [her] intention to report [Officer] Aponte's misconduct to his supervisers" is therefore unavailing. (Pls.' Mem. at 27.) "'[A]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Curley*, 268 F.3d at 73 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Therefore, Plaintiff has failed to offer sufficient evidence in support of the third element of her First Amendment retaliation claim based on her arrest. Accordingly, Defendants' motion for summary judgment is granted as to this claim.

---

a police officer to whom a criminal complaint is made beat the complainant on the head with a nightstick to punish him for making the complaint, surely the law would not deny him a remedy because he continues to complain thereafter." *Id.* at 694 n.12. Although the Court agrees that the plaintiff in that hypothetical would not be without a remedy, the remedy would likely be a section 1983 claim based on the Fourth Amendment and Due Process Clause. In a claim for retaliation under the First Amendment, a plaintiff must demonstrate a First Amendment harm. Where the retaliation claim is brought by a private citizen alleging that he or she was arrested in retaliation for criticizing public officials, the relevant First Amendment harm is a chilling effect on the arrestee's speech. *See Morrison*, 429 F.3d at 51; *Agostino v. Simpson*, No. 08 Civ. 5760 (CS), 2008 WL 4906140, at *6 (S.D.N.Y. Nov. 17, 2008). The absence of a chilling effect does not preclude other claims under section 1983 for, *inter alia*, excessive force, false arrest, or malicious prosecution, but it is fatal to this type of First Amendment claim.

Plaintiff's claim that she suffered an adverse employment action in retaliation for her threat to report Officer Aponte must also be dismissed because her statements were not related to "matters of public concern." *See Cotarelo v. Village of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) ("A government employee must show that his [or her] speech was on a matter of public concern in order for that speech to be protected under the First Amendment."); *see also Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008) (quoting *Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991)). Plaintiff argues that she engaged in public speech "when she asked defendant Aponte why he had not removed the boot from his car, when she asked for his name and when she stated she was going to report him to a supervisor." (Pl.'s Mem. at 26.) However, in making these statements, Plaintiff was neither seeking to address matters of public concern, nor "on a mission to protect the public welfare." *Ezekwo*, 940 F.2d at 781; *see also Cotarelo*, 460 F.3d at 252 (distinguishing between speech regarding "discrimination problems generally" and speech regarding "instances affecting only [the plaintiff]"). Rather, Plaintiff's speech "was 'calculated to redress personal grievances . . . .'" *Ruotolo*, 514 F.3d at 189 (quoting *Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999)). Therefore, Plaintiff cannot bring a First Amendment retaliation claim under section 1983 as a public employee challenging any of the alleged adverse employment actions that may have resulted from her conduct on April 1, 2005. Accordingly, Defendants' motion for summary judgment is granted as to this claim.

### G. *Monell* Liability

Plaintiff alleges that "[a]s a result of the failure to properly recruit, screen, train, and supervise and discipline its police officers . . . [HHC] has tacitly authorized, ratified, and been deliberately indifferent to, the acts and conduct complained of herein." (Compl. ¶ 43.) These allegations appear to state a claim against HHC for liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Defendants move for summary judgment on this claim, arguing, *inter alia*, that Plaintiff has not identified a causal link between any municipal custom or policy and the constitutional violations alleged by Plaintiff. (Defs.' Mem. at 23.) For the reasons stated below, the Court concludes that summary judgment in Defendants' favor is appropriate.

### 1. Applicable Law

"A municipality may be held liable as a 'person' for purposes of Section 1983 when a civil rights violation results from a municipality's policy or custom." *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 314 (S.D.N.Y. 2008) (citing *Coon v. Town of Springfield*, 404 F.3d 683, 686 (2d Cir. 2005)); *see also Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007). "A plaintiff making a *Monell* claim against a municipality must establish three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Blazina v. Port Auth.*, No. 06 Civ. 481 (KNF), 2008 WL 919671, at *6 (S.D.N.Y. Apr. 1, 2008) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

"To constitute a 'policy,' either the corporation must promulgate an official policy, as that term is commonly understood (i.e., a formal measure by the governing body) or a municipal employee with final policymaking authority in a certain area must undertake the unconstitutional act." *Warheit v. City of New York*, No. 02 Civ. 7345 (PAC), 2006 WL 2381871, at *12 (S.D.N.Y. Aug. 15, 2006). "'[O]ne method of showing custom is to demonstrate that the custom or practice is so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" *Davis v. City of New York*, 228 F. Supp. 2d 327 (S.D.N.Y. 2002) (quoting *Silva v. Worden*, 130 F.3d 26, 31 (1st Cir. 1997)).

### 2. Analysis

Plaintiff does not oppose Defendants' motion for summary judgment as to her *Monell* claims. Nevertheless, the Court "must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

Under *Monell*, "[t]o ensure that a municipality is not 'held liable solely for the actions of its employee,' courts must apply 'rigorous standards of culpability and causation.'" *Warheit*, 2006 WL 2381871, at *12 (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)). The individual Defendants did not have policy making authority at HHC. Nor does Plaintiff allege that her arrest and summonses resulted from an "official municipal policy of some

nature [that] caused a constitutional tort." *Monell*, 436 U.S. at 691.   Rather, Plaintiff alleges in a conclusory fashion that HHC failed "to properly recruit, screen, train, supervise and discipline" its officers.  (Compl. 43.)  These allegations are unsupported by the record, and Defendants are entitled to summary judgment.

In order to sustain a *Monell* claim based on HHC's alleged failure to train or supervise its employees, Plaintiff "must show that the alleged failure 'amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact.'"  *Cerbelli v. City of New York*, No. 99 Civ. 6846 (ARR) (RML), 2009 WL 102082, at *4 (E.D.N.Y. Jan. 14, 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  This version of *Monell* liability is a "rather narrow category."  *Weir v. City of New York*, No. 05 Civ. 9268 (DFE), 2008 WL 3363129, at *7 (S.D.N.Y. Aug. 11, 2008) (citing *Harris*, 489 U.S. at 388).  Plaintiff points to no relevant HHC training policies, and there is nothing in the record to suggest deliberate indifference.   Thus, there are no disputed issues of material fact because Plaintiff has produced no evidence in support of these claims.   Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's *Monell* claims against HHC.

### H.  State Law Claims

The Complaint also contains several remaining causes of action under New York State law.   However, as set forth above, each of Plaintiff's federal claims under 42 U.S.C. §§ 1983 and 1985 are dismissed.   Because jurisdiction in this case is not based on the diversity of the parties, 28 U.S.C. § 1332, the Court only has subject matter jurisdiction to decide the state law claims in the Complaint if supplemental jurisdiction exists under 28 U.S.C. § 1367(a).   *See Wright v. Zabarkes*, No. 07 Civ. 7913 (DC), 2008 WL 872296, at *4 (S.D.N.Y. Apr. 2, 2008).

"Where, as here, all federal claims in a case are dismissed, leaving only state law claims, it is within the discretion of the district court to exercise supplemental jurisdiction over the remaining state law claims." *Stryker v. Stelmak*, No. 06 Civ. 1322 (DC), 2006 WL 3292457, at *5 (S.D.N.Y. Nov. 14, 2006) (citing 28 U.S.C. § 1367(c)(3) and *Purgess v. Sharrock*, 33 F.3d 134, 138-39 (2d Cir. 1994)).   "When all bases for federal jurisdiction have been eliminated . . . the federal court should ordinarily dismiss the state claims." *Bd. of Locomotive Eng'rs Div. 269 v. Long Island R.R. Co.*, 85 F.3d 35, 39 (2d Cir. 1996).   Therefore, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in the Complaint, including the loss of consortium and loss of services claims brought by Plaintiff's husband, Terrance Richardson.

### IV.  CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted as to Plaintiff's federal claims and the state law claims for false arrest and malicious abuse of process.   In light of that conclusion, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in the Complaint.   Accordingly, this action is hereby dismissed.

The Clerk of the Court is respectfully directed to terminate the motion docketed as document number 47, and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge


Dated: March 25, 2009
      New York, New York

           ***

Plaintiffs are represented by Clare Rivka, Norins, Beldock Levine & Hoffman LLP, 99 Park Avenue, 16th Floor, New York, New York 10016.  Defendants are represented by Susan P. Scharfstein, New York City Law Department, 100 Church Street, New York, New York 10007.